UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| MICHAEL C. DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:19-cv-00077-JMS-DML |
| ) | |
| FRANK LOOP, et al. ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING UNOPPOSED MOTION FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

On April 22, 2019, plaintiff Michael Davis brought this action against Floyd County Sheriff Frank Loop and Captain David Furman pursuant to 42 U.S.C. § 1983. Mr. Davis alleges that Sheriff Loop and Captain Furman denied his request for a no-pork Muslim diet in violation of the First Amendment and denied his request for a special diet to accommodate his medical needs in violation of the Fourteenth Amendment during his pretrial detention at Floyd County Jail ("FCJ"). Dkts. 1, 4. He further alleges that on the occasions he was provided a special religious or medical meal tray, his food would often be contaminated with saliva or pubic hair. *Id.* As a result, he alleges that he was often forced to either purchase his food from the commissary or go hungry. *Id.*

On January 27, 2020, Sheriff Loop and Captain Furman filed a motion for summary judgment and requested that the action be dismissed. Dkt. 19. Mr. Davis has not filed a response, nor has he designated any evidence to support his claims, and the time to do so has passed.[1] For

---

[1] On August 27, 2020, the parties appeared for a status conference with the Magistrate Judge, who found that Mr. Davis received service of the defendants' motion for summary judgment. *See* Dkt. 44. At the hearing, Mr. Davis made an oral request for the Court to reconsider its previous Orders denying his motions for assistance recruiting counsel. *See* dkts. 10, 16, 38. Mr. Davis claimed, for the first time, that he is unable to read or write and suffers from other cognitive limitations that have prevented him from litigating this case on his own. As an initial matter, a district court that has properly denied a pro se litigant's motion for counsel is not obligated to reconsider the denial even when the litigant presents new evidence suggesting

the reasons explained below, the motion for summary judgment, dkt. [19], is **granted** and the action is **dismissed with prejudice**.

## I.
## SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*,

---

he is not competent to represent himself. *See Pruitt v. Mote*, 503 F.3d 647, 656 (7th Cir. 2007) ("[A]lthough the judge certainly has the discretion to do so, he has no *obligation* to reconsider a § 1915(e)(1) denial should future events prove the plaintiff less capable than the record indicated when the motion was denied.") (emphasis in original). Furthermore, the Court finds that Mr. Davis' filings in this case and his comments at the status conference demonstrate that he understands the nature of his claims and has some ability to read and write. Given the level of complexity of this case, Mr. Davis has not demonstrated a need for pro bono counsel warranting the use of the Court's limited pro bono resources. *Id.* at 655 ("The decision whether to recruit pro bono counsel is grounded in a two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims himself."); *Cartwright v. Silver Cross Hospital*, 962 F.3d 933, 934 (7th Cir. 2000) ("Pro bono representation of indigent civil litigants is a venerable tradition in the legal profession. The courts must be careful stewards of this limited resource."). For these reasons, the Court declines to reconsider its previous Orders denying Mr. Davis' motions for counsel.

809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II.
## UNDISPUTED MATERIAL FACTS

Mr. Davis was booked into FCJ on April 16, 2018. Dkt. 21-1, p. 6. During the time period relevant to this action, FCJ had a policy of providing special diets to accommodate inmates' medical or religious requirements. Dkt. 21-2, para. 3.

### A. Medical Diets

Pursuant to the FCJ policy on special medical diets, if an inmate requests a special diet for medical reasons at the time he is booked, the booking officer documents the request on the medical screening form, and the form is passed on to the FCJ medical staff. Dkt. 21-1, para. 4. The medical staff then interviews the inmate to discuss the inmate's special dietary needs. *Id.* If the FCJ medical provider determines that the inmate requires a special diet, the provider directs the medical staff to submit a Special Diet Request Form with the provider's specific dietary recommendations to the

FCJ Food Service Manager. *Id.* The kitchen staff then receives this form and implements the medical provider's instructions accordingly. *Id.*

FCJ medical provider Nurse Roy Washington, ARNP, examined Mr. Davis on April 16, 2018. Dkt. 21-6, para. 6; dkt. 21-6, p. 6. During this examination, Mr. Davis complained of chest pressure, hyperactive bowel sounds, and excessive burping. *Id.* He told Nurse Washington that he thought he had been diagnosed with diverticulitis but was not sure. *Id.* Mr. Davis also stated he was allergic to pork and corn and had previously been treated by a primary care physician at Family Health Center. *Id.* At that time, Nurse Washington ordered Mr. Davis to take Prilosec and Lisinopril. *Id.*

On April 17, 2018, FCJ corrections officer Tevin Talbott conducted an Inmate Medical Assessment of Mr. Davis. Dkt. 21-4, para.4; dkt. 21-4, pp. 5-6. During this assessment, Mr. Davis informed Officer Talbott that he was allergic to pork and foods containing seeds and had been allergic to those items "for a long time." Dkt. 21-4, para.5; dkt 21-4, pp. 5-6. Officer Talbott typed what Mr. Davis told him regarding his food allergies verbatim into his Inmate Medical Assessment form. Dkt. 21-4, para.6; dkt. 21-4, pp. 5-6. Mr. Davis did not inform Officer Talbott that his religious beliefs prohibited him from eating certain foods. Dkt. 21-4, para. 7.

On May 3, 2018, Mr. Davis submitted a grievance via the FCJ kiosk system. Dkt. 21-5, para. 3; dkt. 21-5, p. 5. In this grievance, Mr. Davis indicated he was allergic to pork, was lactose intolerant, had diverticulitis, and was unable to eat corn, processed meat, or sliced tomatoes. *Id.* Mr. Davis also stated that he could not eat pork because of his religious beliefs. *Id.* Nurse Courtney Nichols responded to this grievance on May 4, 2018. Dkt. 21-5, para.4; dkt. 21-5, p. 5. Nurse Nichols told Mr. Davis that she would place him on the list to see the FCJ medical provider

regarding his concerns. *Id.* Nurse Nichols then placed Mr. Davis' name on the list to see the FCJ medical provider. *Id.*

Nurse Washington examined Mr. Davis again on May 7, 2018. Dkt. 21-6, para. 7; dkt. 21-6, p. 8. During this examination, Mr. Davis requested a special diet to prevent flare-ups of his diverticulitis. Dkt. 21-6, para. 8; dkt. 21-6, p. 8. Washington then confirmed that Mr. Davis had been diagnosed with diverticulitis by his primary care physician at Family Health Center and ordered Mr. Davis to be placed on a bland diet that excluded processed meats, tomatoes, and foods containing seeds because those were the food items that Mr. Davis indicated had previously caused flare-ups of his diverticulitis. Dkt. 21-6, para. 8; dkt. 21-6, p. 8, 10. Nurse Washington also instructed the medical staff to submit a Special Diet Request Form for Mr. Davis to the kitchen staff. *Id.*

The kitchen received Mr. Davis' Special Diet Request Form later that same day. Dkt. 21-3, para.4; dkt. 21-3, p. 6. Pursuant to this form, specific menu items were substituted for Mr. Davis in lieu of the menu items he was restricted from eating. Dkt. 21-3, para. 5, dkt. 21-3, p. 8.

Mr. Davis filed another Grievance on May 8, 2018. Dkt. 21-5, para.5; dkt. 21-5, p. 8. In this grievance, Mr. Davis complained that he was not receiving any meat and stated he could eat chicken, beef and fish. *Id.* Nurse Nichols responded to this grievance on May 12, 2018, and told Mr. Davis she would follow up with the FCJ medical provider to get clarification on his dietary restrictions. *Id.*

When Nurse Washington was informed that Mr. Davis had complained about not being served meat, he amended the order to allow Mr. Davis to be served processed meats other than pork. Dkt. 21-6, para. 9. Nurse Washington did not believe the reintroduction of processed meats

to Mr. Davis' diet would increase the likelihood of a diverticulitis flare-up as long as Mr. Davis avoided the other food items that had previously caused such flare-ups. *Id.*

On May 16, 2018, the kitchen staff received Mr. Davis' amended Special Diet Request Form and amended his menu substitution list accordingly. Dkt. 21-3, paras., 6, 7; dkt. 21-3, pp. 6, 10. Mr. Davis did not complain again about his diet causing a diverticulitis flare-up. Dkt. 21-6, para. 10.

### B. Religious Diets

Pursuant to the FCJ policy on special religious diets, if an inmate requests a special diet for religious reasons when he first arrives at the facility, the booking officer documents the request in the Jail Management System and instructs the inmate to submit an Inmate Request to the jail administration detailing the request. Dkt. 21-1, para. 5. The administration then investigates the religious diet request and consults with the Indiana Department of Correction religious regulations or religious counsel to determine whether to approve or deny the request. *Id.* Once the inmate's religious diet request is approved, the jail administration forwards the information to the FCJ medical department, and kitchen staff implements the religious dietary request by substituting compliant items in lieu noncompliant menu items. *Id.*

FCJ purposefully serves very few items containing pork to reduce the frequency of religious diet substitutions. *Id.* at para. 6; dkt. 21-3, para. 9. Items such as hot dogs and bologna which are traditionally made of pork are instead made of beef, chicken, or turkey. *Id.* The only pork menu items served on the FCJ menu during the period relevant to this action were breakfast sausage, ham, and pork and beans. *Id.* However, when an inmate has been approved for a no-pork diet, those items are substituted for a non-pork alternative. *Id.* The kitchen staff maintains an

Allergies Logging Sheet listing the inmates who are on no-pork diets for religious reasons. Dkt. 21-3, para.8; dkt. 21-3, p 12.

Mr. Davis' request to be placed on a no-pork diet was granted, and the kitchen staff was instructed to provide him with non-pork alternatives. Dkt. 21-1, para.7. His name was placed on the "No Pork: Religious Menu" section of the Allergies Logging Sheet. Dkt. 21-3, para. 8; dkt. 21-3, p. 12. Whenever the day's menu contained a pork item, Mr. Davis was provided with a non-pork alternative. Dkt. 21-3, para.8.

The kitchen staff ensures the food is hygienic and free of foreign objects by requiring all individuals who came into contact with food to thoroughly wash their hands, avoid cross contamination, and wear hair nets and protective gloves. Dkt. 21-3, para.10.

### C. The Defendants' Roles in Food Service and Medical Care

1. Sheriff Loop

Sheriff Loop was the duly elected Sheriff of Floyd County, Indiana during all times relevant to this action. Dkt. 21-2, para.2. He was not personally involved in determining the special dietary needs of individual inmates or in implementing those individual dietary needs. *Id.* para.6. He did, however, oversee policies and procedures to ensure the accommodation of FCJ inmates' medical and religious dietary requirements. *Id.* Sheriff Loop did not personally prepare or serve food to the inmates. *Id.* at para.11. The kitchen staff is responsible for preparing inmate meals, serving the meals to inmates, and ensuring each respective inmate is served menu items in accordance with that inmates' medical and religious requirements. *Id.*

At no time did Mr. Davis submit a request to Sheriff Loop about changing his diet, and Sheriff Loop was not aware of Mr. Davis' specific dietary requirements. *Id.* at 13. Sheriff Loop

was never aware of Mr. Davis' food containing saliva or pubic hair, nor did he ever place any such substances into Mr. Davis' food. *Id.*

Sheriff Loop is not a medical professional and did not provide medical care to Mr. Davis or any other inmate. *Id.* at para. 8. Instead, he sought to ensure that inmates receive appropriate medical care by hiring or contracting with medical professionals. *Id.* at para.14. Because Sheriff Loop is not a medical professional, he relied on the medical staff to make decisions about the medical care provided to Mr. Davis and other inmates. *Id.* para.15. Sheriff Loop had no reason to believe that Mr. Davis had a serious medical need that was being ignored by the FCJ medical staff or kitchen staff. *Id.* at para.10.

Although Sheriff Loop was the final decisionmaker and policymaker at FCJ in regarding administrative and security policies, he was not the final decision maker regarding medical decisions or decisions relating to inmate medical dietary requirements. *Id.* at para.13

### 2. Captain Furman

Captain Furman was the FCJ Commander at all times relevant to this action. Dkt. 21-1, para. 2. He did not personally prepare or serve food to the inmates at FCJ. *Id.* at para.11. He was not aware of Mr. Davis' specific dietary requirements. *Id.* He had no reason to believe that Mr. Davis had a serious medical need that was being ignored by the FCJ medical staff or kitchen staff. *Id.* at para. 10. He was never aware of Mr. Davis' food containing saliva or pubic hair, nor did he ever place any such substances into Mr. Davis' food. *Id.*

Captain Furman is not a medical professional, nor did he ever personally provide medical care to Mr. Davis or any other inmate. *Id.* at para.8. Instead, he sought to ensure that inmates receive appropriate medical care by hiring or contracting with medical professionals. *Id.* at para.12. Because he is not a medical professional, he relied upon the medical staff to make decisions about

the medical care provided to Mr. Davis and other inmates. *Id.* para.10. He did not have any personal involvement in Mr. Davis' medical care and treatment, nor did he determine what dietary restrictions were medically necessary for Mr. Davis. *Id.* at para. 9.

## III.
## DISCUSSION

### A. Legal Standards

#### 1. Fourteenth Amendment Medical Claims

Mr. Davis was a pretrial detainee at the time he was allegedly denied a special diet to accommodate his medical needs. Therefore, his claims are properly analyzed under the objective unreasonableness standard of the Fourteenth Amendment. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). "[T]he controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). The first step "asks whether the [] defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's case]." *Id.* (quoting *Miranda*, 900 F.3d at 353). Negligence or even gross negligence is not enough. *Id.* In the second step, the Court focuses "on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively – without regard to any subjective belief by the individual – whether the response was reasonable." *Id.* Interference with prescribed treatment, including a medically appropriate diet, is a well-recognized example of how nonmedical prison personnel can create objectively unreasonable conditions of confinement. *McDonald v. Hardy*, 821 F.3d 882, 890 (7th Cir. 2016).

#### 2. First Amendment Religious Diet Claims

To avoid summary judgment on a First Amendment claim, a pretrial detainee must present evidence from which a reasonable jury could find that the defendants placed a "substantial burden"

on his ability to practice his religion. *Thompson v. Bukowski*, ___ F. App'x ___, 20 WL 2097278 *3 (7th Cir. 2020) (citing *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013)). "[A] substantial burden on the free exercise of religion . . . is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Koger v. Bryan*, 523 F.3d 789, 798 (7th Cir. 2008) (internal quotation and citation omitted). It is not for the Court to determine whether the plaintiff's "religious beliefs are mistaken or insubstantial . . . Instead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction." *Hobby Lobby*, 134 S. Ct. at 2779. "[A] prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition." *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009).

### 3. Individual Liability under § 1983

"Individual liability under § 1983… requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

### B. Analysis of Claims Against Sheriff Loop and Captain Furman

There is no evidence that Mr. Davis was denied a special diet to accommodate his medical needs or his religious beliefs. His requests for a special diet were processed pursuant to the FCJ policies for assessing and providing special diets. Both requests were ultimately granted, and the kitchen staff was instructed to provide him with non-pork alternatives, as well as alternatives to food items that have historically caused him to experience diverticulitis flare-ups. Contrary to the allegations in the complaint, there is no evidence that Mr. Davis' special diet meal trays were ever contaminated with saliva or pubic hair.

There is also no evidence that Sheriff Loop or Captain Furman were personally involved in the assessment or implementation of Mr. Davis' requests for a special diet. As supervisory officials, the defendants were not involved in individual inmates' requests for special diets. Even if Mr. Davis had suffered a constitutional deprivation, the defendants may not be held liable for the unlawful conduct of others under § 1983.

Finally, the Court finds that Mr. Davis' complaint is not evidence, and the allegations in the complaint do not create any genuine issues of material fact. When a plaintiff is proceeding pro se, the Seventh Circuit has held that

> a verified complaint—signed, sworn, and submitted under penalty of perjury—may be considered 'affidavit material' *provided* the factual allegations otherwise satisfy the affidavit criteria specified in Rule 56 of the Federal Rules of Civil Procedure *and* the declarant complies with 28 U.S.C. § 1746, which sets forth the requirements for verification under penalty of perjury.

*James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020) (emphasis in original) (quoting *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996)). Mr. Davis' complaint was not sworn or submitted under penalty of perjury and therefore does not meet this standard.

## IV.
## CONCLUSION

For the reasons explained above, the defendants' motion for summary judgment, dkt. [19], is **granted**. Mr. Davis' motion asking the Court to assist him with filing a new civil rights complaint, dkt. [32], is **denied**.

Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED**.

Date: 9/2/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

MICHAEL C. MR. DAVIS
126199
FLOYD COUNTY JAIL
FLOYD COUNTY JAIL
Inmate Mail/Parcels
P.O. Box 1406
New Albany, IN 47150

Corey J. Dunn
KIGHTLINGER & GRAY LLP
cdunn@k-glaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP (New Albany)
jlowe@k-glaw.com